UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                            :
UNITED STATES OF AMERICA,                                   :
                                                            :
                                                            :
                                                            :      **MEMORANDUM & ORDER**
          v.                                                :      20-CR-293 (WFK)
                                                            :
OLUWAGBENGA AGORO, LORENZO BAILEY,:
QUINCY BATTICE, and JEAN FREMONT,                           :
                                                            :
          Defendants.                                       :
------------------------------------------------------------X
------------------------------------------------------------X
                                                            :
UNITED STATES OF AMERICA,                                   :
                                                            :
                                                            :      **MEMORANDUM & ORDER**
          v.                                                :      21-CR-166 (WFK)
                                                            :
OLUWAGBENGA AGORO,                                          :
                                                            :
          Defendant.                                        :
------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On August 4, 2021, the United States of America filed a twenty-count Superseding Indictment ("VICAR Superseding Indictment") in 20-CR-293 ("VICAR Action"). On March 26, 2021, the United States of America filed a two-count Indictment ("Extortion Indictment") in 21-CR-166 ("Extortion Action"). Beginning on October 17, 2022, the Court presided over the jury trial of Oluwagbenga Agoro ("Defendant Agoro"), Lorenzo Bailey ("Defendant Bailey"), Quincy Battice ("Defendant Battice"), and Jean Fremont ("Defendant Fremont") (collectively, "Defendants"). Both the VICAR and Extortion Actions were tried together. On November 18, 2022, the jury acquitted each Defendant of one attempted murder in-aid-of racketeering count, and convicted Defendants on all remaining Counts applicable to each Defendant. Before the Court are Defendants' motions to set aside the jury verdict or, in the alternative, grant a new trial; Defendant Bailey's motion to compel the Government to disclose *Giglio* material; and Defendant Agoro's *pro se* letter motion and further requests to the Court. For the reasons set forth below, Defendants' motions and requests are DENIED in their entirety.

## BACKGROUND

On November 18, 2022, a jury convicted Defendants Agoro, Bailey, Battice, and

Fremont of (1) conspiracy to murder rival gang members, in violation of New York Penal Law

("NYPL") §§ 125.25(1) and 105.15 and 18 U.S.C. §§ 1959(a)(5) and 2; (2) attempted assault with a dangerous weapon in-aid-of racketeering, in violation of NYPL §§ 120.05(2), 110.00, and 20.00 and 18 U.S.C. §§ 1959(a)(6) and 2; (3) attempted murder in-aid-of racketeering, in violation of NYPL §§ 125.25(1), 110.00, and 20.00 and 18 U.S.C. §§ 1959(a)(5) and 2; (4) assault with a dangerous weapon in-aid-of racketeering, in violation NYPL §§ 120.05(2) and 20.00 and 18 U.S.C. §§ 1959(a)(3) and 2; and (5) possessing, brandishing, and discharging a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) - (iii) and 2. Counts 1, 3, 4, 5, and 6, Jury Verdict; Counts 10, 12, 13, 14, and 15, VICAR Superseding Indictment. Defendants Agoro and Fremont were additionally convicted by the same jury of: (6) attempted murder in-aid-of racketeering, in violation of NYPL §§ 125.25(1), 110.00, and 20.00 and 18 U.S.C. §§ 1959(a)(5) and 2; (7) assault with a dangerous weapon in-aid-of racketeering, in violation of NYPL §§ 120.05(2) and 20.00 and 18 U.S.C. §§ 1959(a)(3) and 2; and (8) possessing, brandishing, and discharging a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) - (iii) and 2. Counts 9, 10, and 11, Jury Verdict; Counts 18, 19, and 20, VICAR Superseding Indictment. The same jury further convicted Defendant Agoro of: (9) attempted murder in-aid-of racketeering, in violation of NYPL §§ 125.25(1), 110.00, and 20.00 and 18 U.S.C. §§ 1959(a)(5) and 2; (10) attempted assault with a dangerous weapon in-aid-of racketeering, in violation of NYPL §§ 120.05(2), 110.00, and 20.00 and 18 U.S.C. §§ 1959(a)(6) and 2; and (11) threatening physical violence in furtherance of a plan to commit extortion, in violation of 18 U.S.C. §§ 1951(a) and 2. Counts 7, 8, and 12, Jury Verdict; Counts 16 and 17, VICAR Superseding Indictment; Count 1, Extortion Indictment. Defendants were all acquitted of one count of attempted murder in-aid-of racketeering, in

violation of NYPL §§ 125.25(1), 110.00, and 20.00 and 18 U.S.C. §§ 1959(a)(5) and 2, as

alleged in Count 11 of the VICAR Superseding Indictment.  Count 2, Jury Verdict.

On January 6, 2023, Defendant Bailey moved to vacate the jury's verdict and grant a new

trial under Rule 33 of the Federal Rules of Criminal Procedure.  *See* ECF Nos. 568, 569, 569-1.

Defendants Agoro, Battice, and Fremont each joined these motions.  *See* ECF Nos. 570, 571,

572.  In Defendants' Rule 33 Motions, including supporting affidavits, memoranda of law,

replies, and supplemental letters, Defendants argue:  (1) the Government failed to establish the

existence of an "enterprise" required for "violence in-aid-of racketeering" charges; (2) even if

the Government had established that an enterprise existed, that alleged enterprise was not

engaged in statutorily defined "racketeering activity;" (3) the admission of hospital records from

shooting victims and screenshots of gang organizational charts from a contraband prison cell

phone violated Defendants' Sixth Amendment right to confrontation; and (4) the Government

improperly withheld *Giglio* materials related to the Federal Bureau of Prisons ("BOP")

investigation file pertaining to the contraband prison cell phone's discovery which Defendants

could have used to impeach the credibility of the alleged author of the gang organizational

charts.  As to Defendant Bailey specifically, he argues:  (1) the Government's summation

included improper "testimony" on the part of the Assistant United States Attorney ("AUSA"),

constituting prosecutorial misconduct; and (2) there was insufficient evidence to support his

convictions, specifically evidence that Defendant Bailey:  (a) was a member of the alleged

enterprise at all, let alone during the relevant time period; (b) was part of the charged conspiracy

to murder rival gang leaders; (c) participated in the November 7, 2020 shootings; (d) participated

in order to increase his position in the alleged enterprise; or (e) acted with an intent to kill. *See* ECF Nos. 568, 569, 569-1, 597, 598, 600, 606, 618, 637, 649, 658, 698, 723.[1]

On July 24, 2023, Defendant Bailey moved to compel the Government to disclose the following underlying materials pertaining to Detective Valcourt, which Defendant Bailey argues are *Giglio* material: "transcripts of interviews and hearings; audio recordings, complaints and investigative materials relating to all allegations against Det. Valcourt, not only by IAB, but by all divisions of the NYPD, as well as complaints investigated by the CCRB, including unsubstantiated CCRB complaints, so that the court can determine what documents are *Giglio* material that must be provided to the defendant."[2] ECF No. 610 at 2; *see also* ECF Nos. 622, 638, 609.

Defendant Agoro further submitted numerous post-trial letters on a *pro se* basis. *See* ECF Nos. 552, 573, 594, 595, 596, 601, 602, 603, 605, 611, 617, 639, 640, 641, 662.

The Court addresses each argument in turn.

## DISCUSSION

I.    <u>Rule 33 Motions</u>

    A.    <u>Legal Standard</u>

After the jury renders a guilty verdict in a criminal case, Rule 33 of the Federal Rules of Criminal Procedure permits a court to "vacate any judgment and grant a new trial if the interest

---

[1] Defendant Bailey raised a number of arguments for the first time on reply, including (1) Defendant Bailey's convictions under Counts 13 and 14 violate double jeopardy; (2) there was insufficient evidence to support his § 924(c) conviction; and (3) that his convictions for attempted assault and attempted murder cannot stand because they have contradictory intent. *See* ECF No. 598 at 2-4, 10-11.  The Court does not consider these arguments. *See Zirogiannis v. Seterus, Inc.*, 221 F. Supp. 3d 292, 298 (E.D.N.Y. 2016) (Feuerstein, J.), *aff'd,* 707 F. App'x 724 (2d Cir. 2017) ("It is well-established that '[a]rguments may not be made for the first time in a reply brief.'  Therefore, '[n]ew arguments first raised in reply papers in support of a motion will not be considered.'") (internal citations omitted) (alterations in original).

[2] This quotation includes the following acronyms: NYPD, which is short for the New York City Police Department; IAB, which is short for the Internal Affairs Bureau of the NYPD; and CCRB, which is short for the New York City Civilian Complaint Review Board.  The Court will use these acronyms throughout the opinion.

of justice so requires." Fed. R. Crim. P. 33(a). The Rule "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).

The Court's Rule 33 authority should be used "sparingly" and only in "the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *Sanchez*, 969 F.2d at 1414) (internal quotation marks omitted). "[M]otions for a new trial are disfavored in this Circuit." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995). The court should "examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Ferguson*, 246 F.3d at 134. "There must be a real concern that an innocent person may have been convicted" in order to grant the motion, *Sanchez*, 969 F.2d at 1414, as "the 'ultimate test' for [Rule 33 motions] is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (citation omitted).

When reviewing a Rule 33 motion predicated on insufficient evidence, the Court must undertake "an objective evaluation of the evidence and an assessment of whether the evidence preponderates heavily against the verdict." *United States v. Landesman*, 17 F.4th 298, 331 (2d Cir. 2021). When exercising its discretion, a court "must be careful not to wholly usurp the role of the jury, and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless 'exceptional circumstances can be demonstrated.'" *United States v. Teman*, 465 F. Supp. 3d 277, 292 (S.D.N.Y. 2020) (Engelmayer, J.) (quoting *Sanchez*, 969 F.2d at 1414). Indeed, "a district court may not grant a Rule 33 motion based on the weight of evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be

5

'manifest injustice' to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (citing *Sanchez*, 969 F.2d at 1414). The *Landesman* Court explained:

> Under the "preponderates heavily" standard, which was first articulated in *Sanchez* and later applied in *Archer*, "a district court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Archer*, 977 F.3d at 188 (internal quotation marks omitted). "To the contrary, absent a situation in which," for example, "the evidence was 'patently incredible or defie[d] physical realities,' ... where an evidentiary or instructional error compromised the reliability of the verdict," *id.* (internal citation omitted) (quoting *Ferguson*, 246 F.3d at 134), or where the government's case depends upon strained inferences drawn from uncorroborated testimony, "a district court must 'defer to the jury's resolution of conflicting evidence.'" *Id.* (quoting *McCourty*, 562 F.3d at 475-76); *see also Ferguson*, 246 F.3d at 136-37 (affirming district court's grant of Rule 33 motion where, among other things, there was no evidence that the defendant participated in the gang's activities and the only evidence supporting his gang membership was the speculative testimony of one of the government's witnesses.

*Landesman*, 17 F.4th at 331. The preponderates heavily standard applies both in cases "in which a district court, after discounting certain questionable evidence, must assess the weight of the remaining evidence supporting the conviction" *and* "with equal, if not stronger, force to cases in which a district court examines the weight of the evidence as a whole - all of which the jury reasonably and appropriately relied on in reaching its verdict." *Archer*, 977 F.3d at 188.[3]

Indeed, courts "may not weigh the competing inferences and choose the one it finds '[m]ore

---

[3] Defendant Bailey points the Court to *United States v. Rafiekian*, 68 F.4th 177 (4th Cir. 2023), for two propositions: (1) "a Rule 33 motion may be granted even where the Government has presented sufficient evidence for a reasonable jury to convict, but when the court disagrees with the jury's 'weighing of the trial evidence'" and (2) "in adjudicating a Rule 33 motion, the Court sits as a 'thirteenth juror,' unconstrained by responsibility to view the trial testimony in the light most favorable to the Government." ECF No. 600 at 1-2 (citing *Rafiekian*, 689 F. 4th at 186). While the first cited proposition—from an out-of-Circuit case—does not contradict the Second Circuit's preponderates heavily standard, the "thirteenth juror" analogy has not been utilized by the Second Circuit and has been criticized by a Second Circuit judge. *See Ferguson*, 246 F.3d at 139 (Walker, J., concurring in part and dissenting in part) ("Like many legal metaphors, the 'thirteenth juror' analogy lacks precision. It fails to convey the considerable circumspection that this court has required of district courts' decisions on Rule 33 motions based on the weight of the evidence."). The Court will apply the preponderates heavily standard as required by and in line with Second Circuit precedent.

likely.'" *Archer*, 977 F.3d at 195 (citation omitted) (alteration in original).  The "mere fact that competing inferences existed does not compel a finding that the evidence preponderated heavily against the verdict." *Id.*

### B. Sufficiency of the Evidence: VICAR

#### a. VICAR Generally

The majority of Defendants' convictions related to violations of 18 U.S.C. § 1959, which outlines the definition and penalties for "Violent crimes in aid of racketeering activity" ("VICAR").  The VICAR statute states:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished . . . .

18 U.S.C. § 1959(a).  18 U.S.C. § 1959(b)(2) defines "enterprise" as including "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce."  18 U.S.C. § 1959(b)(1) incorporates the definition of racketeering from 18 U.S.C. § 1961, which defines "racketeering activity" as an exhaustive list of potential crimes.

#### b. As to All Defendants: Enterprise and Racketeering Activity

##### i. Parties' Arguments

Defendants argue that the Government did not provide legally sufficient evidence to support the existence of an "enterprise"—in this case, the "Folk Nation Gangster Disciples" gang ("GD")—as defined in the VICAR statute.  *See* ECF No. 568 at 2, 6, 9-10; ECF No. 597 at 1-3.

7

Defendants assert that the Government's primary evidence in support of the existence of an "enterprise" was the "testimony of its sole cooperating witness Christian Williams," ECF No. 568 at 2, ECF No. 597 at 2, whose alleged membership in GD was "effectively terminated" upon his arrest prior to the November 7 and November 9 shootings. ECF No. 597 at 2. Defendants argue that relying on Williams' testimony to establish an enterprise fell "decidedly short," as following his arrest "[t]here was no proof elicited that the enterprise continued, or that there was a 'pattern' of criminal acts not committed on an *ad hoc* basis, but as a pattern and 'enterprise activity' on, or around, November 7th, 2020." *Id.* at 2; *see also* ECF No. 568 at 4, 9-10. Defendants further argue that other evidence purporting to establish the existence of an enterprise was also insufficient, specifically challenging displays that "the association, and non-criminal contacts, among Lorenzo Bailey and other alleged [GD] members who were also charged, and with other members who were not charged," ECF No. 568 at 2, and a list outlining alleged GD members and members' positions within the alleged enterprise. ECF No. 597 at 2; ECF No. 598 at 4-6. Finally, Defendants argue that the Government failed to establish the existence of an enterprise because the Government did not present evidence that a purpose of the enterprise was to "generate profits for the enterprise," as there was no "evidence that the alleged members' criminal activities were for the purpose of generating profits for [GD], and not merely for themselves" or that "alleged [GD] gang members shared their ill-gotten gains with its alleged members." ECF No. 598 at 5; *see also* ECF No. 568 at 3.

Defendants further argue that, even if the Government did establish the existence of an enterprise during the relevant time period, it did not establish that the (1) affected interstate commerce, ECF No. 569-1 at 2, or (2) was engaged in statutorily defined "racketeering" activity, ECF No. 568 at 2-3, 7, ECF No. 598 at 4-6. Defendants highlight the relevant statutory

8

definition of "racketeering activity," which they note does not include assault.  ECF No. 568 at

7; *see also* 18 U.S.C. § 1961(1).  Defendants assert that Williams' testimony demonstrates that

"shootings were meant to 'send a message,' not to kill anyone," and as such constitutes assault as

opposed to attempted murder.  *See* ECF No. 568 at 2-3, 7; *see also* ECF No. 569-1 at 4; ECF No.

598 at 4-6.  Therefore, Defendants claim, this activity was not racketeering within the statutory

definition, and Defendants' VICAR convictions cannot stand.  *See* ECF No. 598 at 5-6; *see also*

ECF No. 568 at 7.

The Government rejects these arguments, asserting that it presented significant evidence

supporting Defendants' convictions.  *See* ECF No. 575 at 3-4.

ii.  <u>Analysis</u>

The Government presented arguments and evidence proving GD existed:  both at the time

of the instant charges and otherwise, as a racketeering enterprise which affected interstate

commerce.  The evidence does not preponderate heavily against such a finding.  The

Government details portions of the evidence offered during the trial to support such a

racketeering enterprise, *see* ECF No. 575 at 3-4, and the Court now identifies that evidence.

"An enterprise is 'a group of persons associated together for a common purpose of

engaging in a course of conduct.'"  *United States v. Mejia*, 545 F.3d 179, 203 (2d Cir. 2008)

(quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)); *see also* 18 U.S.C. § 1959(b)(2).

"This enterprise must have an existence separate from the series of criminal acts that constitute

its racketeering activity."  *Mejia*, 545 F.3d at 203.  "[A]n association-in-fact enterprise is simply

a continuing unit that functions with a common purpose."  *United States v. Arrington*, 941 F.3d

24, 37 (2d Cir. 2019) (quoting *Boyle v. United States*, 556 U.S. 938, 948 (2009) (internal

quotation marks omitted).

The Government argued and presented significant evidence of GD's operation as an association-in-fact enterprise. Williams gave extensive testimony over multiple days detailing: (1) GD's existence as a gang; (2) GD's organization, including neighborhood-based subsets such as "No Love City" ("NLC"), the hierarchies within GD and NLC, and that GD and NLC had members and associates; (3) GD identifiers, slang, and symbols; and (4) members and associates of GD, including Defendants. ECF No. 575 at 3 (citing provisions of trial transcript); *see also* Government Exhibit ("GX") 19105E (gang lineup, listing gang members and hierarchy); GX 19105D (gang lineup, listing gang members and their positions within the gang); *see generally Mejia*, 545 F.3d at 203 ("Multiple witnesses described MS-13's membership rules, organizational treasury, and symbols."). Williams testified to GD's "purpose": "we want to be the best at everything. We want to have the most. We want to be seen as the most violent gang." ECF No. 575 at 3 (quoting Tr. 291) (internal quotation marks omitted). Williams went on to explain that "[t]he more violence we do the better the gang do . . . . to the people that's in the gang. Better to the people that we have problems with." Tr. 365; *see also* Tr. 371 (explaining that his third shooting had a good effect on his status in the gang because "it looks like all I want to do is violence now" and that is a "good thing" for the gang).

The Government's argument that GD is an enterprise was further supported by extensive evidence of GD members and associates, including Defendants, "associating together, using GD symbols and slang and sometimes explicitly referring to GD, the Folk Nation[,] or NLC," and "digital conversations among gang members discussing gang business." ECF No. 575 at 3-4 (citing Government exhibits); *see also* GX 13325A (as explained on pages 2768-69 of the trial transcript, photograph of Defendants Battice and Bailey both displaying gang hand symbols). Some of those conversations "discussing gang business" included discussions of mandatory gang

10

member check ins and dues, *see* GX 11202 (file 1B59_Agoro, at 23-24); spinning,[4] *see* GX

11202 (file 1B59_Agoro, at 36); the gang's organizational structure, *see* GX 11202 (file

1B59_Agoro, at 37), GX 11202A; and New York GD House Policies, *see* GX 11202 (file

1B59_Agoro at 37-38).[5]

Contrary to Defendants' assertions the Government failed to present evidence the

enterprise existed during the relevant time period, messages in evidence reference—and the

Government argued that they did in fact reference—the November 7 and November 9 shootings.

*See, e.g.*, GX 11107 at 7 (Defendant Agoro telling NLC leader Ronald Britton that he "went on a

drill cause one of the older bro's got his chain took" and "now that's costing me a lot bro")[6].

Particularly revealing are text messages between Defendants Destine and Thompson on

November 7, 2020 and November 8, 2020.  *See generally* GX16104E (file YL Thompson Chat at

10-19).  On November 7, 2020, after Defendant Thompson told Defendant Destine to check the

Canarsie Citizens app as proof that he was "back," Defendant Destine sent Defendant Thompson

a screenshot of the Canarsie Citizens app referencing the second November 7, 2020 shooting, *see*

GX 16104E_1, and said "Citizen saying ya tossed" a gun; Defendant Thompson responded "Nah

hell no we got everything."  *Id.* at 11-13; *see generally* Tr. 361, 429.  Later that day, Defendant

Destine told Defendant Thompson "I want a Pete."  GX16104E (file YL Thompson Chat at 14);

---

[4] *See* Tr. 428 ("Q:  What does it mean to 'spin'?  A:  A shooting.").

[5] These policies, sent to Defendant Agoro by Defendant Hans Destine, included the following:  "Every deck should create a set of house Policies in accordance with the Nations Law & these House policies[;]" "[t]hose House Policies must also meet the specific needs of that deck so the deck can be as one with the rest of the Nation[;]" and "once we are out of state our Decks do not follow us.  We became Representatives of NYG and will Stand on it wholeheartedly.  GDN All is One!"  GX 11202 (file 1B59_Agoro at 37-38); *see also* Tr. 498 (Williams testifying that GDN stands for "Gangsta Discipline Nation," which is the same thing as GD).

[6] The Government argued and presented evidence supporting that Britton was NLC's leader.  *See* GX 120B (final version of headshot board indicating Cam, Ronald Britton, and Cam Right are the same person); *see also* Tr. 302 (Williams testifying that "Cam" is in charge of NLC); Tr. 539 (Williams testifying that Cam is "[t]he top member of No Love City"); Tr. 2964 (the Court noting that on the headshot boards of GX120A and GX120B, the person at the top of the board is "Cam, Ronald Britton, Cam Right," followed by a phone number).

11

*see also* Tr. 429 (Williams testifying that a "pete" means murder).  On November 8, 2020,

Defendant Destine sent Defendant Thompson a surveillance video of a shooting.  *See* GX16104E

(file YL Thompson Chat at 17); GX16104E_2 (video); *see also* GX 6302 (surveillance video

from inside bodega in front of which the second November 7 shooting took place); Tr. 2280-82

(testimony establishing same).  Defendant Thompson responded with a colloquialism for

laughing and asked Defendant Destine how he got the video.  *See* GX16104E (file YL

Thompson Chat at 18).  Defendant Destine responded:  "Bro im in these streets for real imma get

way one way or the other," "Its called art of war," and "Gotta have a eye on the opps at all

times.").  *Id.* at 18-19; *see also* Tr. 430 (Williams testifying that an "opp" is an "enemy").  Taken

together, this evidence does not preponderate heavily against a finding that GD existed as an

enterprise, including during the relevant time period.  *See Mejia*, 545 F.3d at 202-03 (on an

insufficiency of the evidence appeal and "[d]rawing all reasonable inferences in favor of the

Government," finding an enterprise existed in light of testimony showing a gang "to be a

national organization, organized into local subunits, with its own leadership structure,

membership rules, symbols, policies, and financial operations").

The Court disagrees with Defendants' further assertion that the Government failed to

"competently establish the existence of a racketeering 'enterprise' which . . . affected interstate

commerce."  *See* ECF No. 569-1 at 2.  "To secure conviction on any of the four VICAR counts,

the government was required to prove that [the] racketeering enterprise 'engaged in,' or that its

'activities . . . affect[ed], interstate or foreign commerce.' 18 U.S.C. § 1959(b)(2) [(second

alteration in original)].  This burden is not a heavy one, and can be satisfied by 'even a *de*

*minimis* effect on interstate commerce.'"  *United States v. Aquart*, 912 F.3d 1, 17-18 (2d Cir.

2018) (quoting *Mejia*, 545 F.3d at 203).

The Court agrees with the Government that Williams "provided evidence that GD affected interstate commerce, by both operating in multiple states and by dealing drugs." ECF No. 575 at 3 (citing Tr. 282, 284, 323, 335). In light of Williams' testimony, the Court finds that the evidence does not preponderate heavily against a finding that GD affected interstate commerce. *See Aquart*, 912 F.3d at 17-18 (explaining that, in *Gonzales v. Raich*, 545 U.S. 1 (2005) and *Taylor v. United States*, 579 U.S. 301 (2016), "the Supreme Court has recognized that drug trafficking, even local trafficking, is part of an economic class of activities that have a substantial effect on interstate commerce") (citation and internal quotation marks omitted).

The Court also rejects Defendants' argument—made without citation—that the Government failed to establish that one of GD's purposes "is to generate profits for the enterprise." *See* ECF No. 598 at 5; *see also* ECF No. 568 at 3. In *United States v. Concepcion*, the Second Circuit found the VICAR and RICO statutes' definitions of "enterprise" were "meant to have the same scope," noting that the only difference between the statutes' definitions is the VICAR statute "includes [a] commerce requirement, whereas in RICO that requirement appears in each of the sections stating the substantive prohibitions of activities with respect to enterprises." 983 F.2d 369, 380-81 (2d Cir. 1992) (internal quotation marks and citations omitted); *see also id.* at 381 ("Thus, § 1959 complements RICO by allowing the government not only to prosecute under RICO for conduct that constitutes a pattern of racketeering activity in connection with an enterprise, but also to prosecute under § 1959 for violent crimes intended, *inter alia,* to permit the defendant to maintain or increase his position in a RICO enterprise."). Because the two statutes have the same scope, the Court applies caselaw interpreting the RICO statute's definition of enterprise. *See Mejia*, 545 F.3d at 203 (citing *Turkette*, which interprets the definition of enterprise under RICO, for applicable definition of

enterprise under VICAR statute); *United States v. Kamahele*, 748 F.3d 984, 1007 (10th Cir.

2014), *post-conviction relief granted on other grounds in Kamahele v. United States*, 2:08-CR-

758-TC, 2023 WL 5279770 (D. Utah Aug. 16, 2023) ("We have elsewhere concluded that the

Government presented sufficient evidence for the jury to regard TCG as an 'enterprise' under

RICO. The same reasoning would have allowed the jury to find an 'enterprise' under VICAR.");

*United States v. Phillips*, 239 F.3d 829, 843 (7th Cir. 2001) ("Therefore, cases decided under

[RICO's enterprise definition] may also be used to determine what constitutes an enterprise

under § 1959."); *United States v. Rogers*, 89 F.3d 1326, 1335 (7th Cir. 1996) (after citing

*Concepcion*'s reasoning, stating that "[w]e thus draw on cases decided under [RICO's enterprise

definition] to determine what constitutes an enterprise under Section 1959").

     The Supreme Court's decision in *National Organization for Women, Inc. v. Scheidler*

held RICO does *not* "require[] proof that either the racketeering enterprise or the predicate acts

of racketeering [be] motivated by an economic purpose." 510 U.S. 249, 252 (1994); *see id.* at

257-258 ("Arguably an enterprise engaged in interstate or foreign commerce would have a

profit-seeking motive, but the language in § 1962(c) does not stop there; it includes enterprises

whose activities 'affect' interstate or foreign commerce. Webster's Third New International

Dictionary 35 (1969) defines 'affect' as 'to have a detrimental influence on—used especially in

the phrase *affecting commerce*.' An enterprise surely can have a detrimental influence on

interstate or foreign commerce without having its own profit-seeking motives."). As such, the

Court rejects Defendants' argument that the VICAR statute requires an enterprise thereunder to

have a profit-seeking motive.

     The Government also argued and presented evidence that GD engaged in racketeering

activity as defined in 18 U.S.C. § 1961(1). "Where individuals are associated only 'in fact,'

determining whether the subject enterprise engaged in racketeering activity requires fact-based attention to the ways in which, for example, the individuals acted for the group and/or in concert with other members, or acted in ways that contributed to the purposes of the group, or that were facilitated or made possible by the group." *United States v. Feliciano*, 223 F.3d 102, 116-17 (2d Cir. 2000). Williams testified he committed "shootings," "sold drugs," and engaged in counterfeit currency scams with GD. Tr. 284, 372. He further testified GD members and associates have committed "[s]hootings," "robberies," sold drugs, and engaged in counterfeit currency scams. Tr. 286-89, 322-23, 335, 372. Williams testified extensively about how he and other individuals affiliated with the gang would engage in shootings as part of their gang membership; how engaging in shootings and killing people would increase gang members' status in GD; that the general purpose of shootings in the context of GD is "to kill somebody;" and that on multiple occasions, GD leadership wanted Williams to kill someone via a shooting in retaliation for another gang member's death. *See* Tr. 360-371.[7] Indeed, as alluded to above and further discussed below, the Government established a conspiracy among GD members, including Defendants, to murder rival gang members. *See, e.g., supra* at 11-12; *infra* at 21-25. Contrary to defense counsel's assertions that "[t]he alleged enterprise was not engaged in 'racketeering activity' as defined by 18 USC § 1961(a) because there was no evidence that the alleged enterprise committed crimes described in 18 USC § 1961(a)," *e.g.*, ECF No. 568 at 6, the Court finds there was evidence supporting the fact GD was engaged in racketeering activities and the evidence did not preponderate heavily against such a finding. *See* 18 U.S.C. § 1959(b)

---

[7] This testimony contravenes Defendants' assertions that "assuming that [GD]'s members historically committed drive-by shootings and thereby satisfied § 1961(a) criteria, no evidence in the case indicated that their intention was to murder someone." ECF No. 568 at 7. Indeed, in Defendants' reply, they explicitly acknowledge Williams did not "retract[] his dubious testimony that shootings were intended to kill someone[]" in their argument that "Williams confessed that some shootings were meant to 'send a message' to rivals, not to kill anyone." ECF No. 598 at 5. Indeed, Williams explicitly responded to defense counsel's questions on cross-examination explaining that when he went on certain shootings he intended to kill people, and during other times he did not want to kill. *See* Tr. 717.

(incorporating racketeering activity definition from 18 U.S.C. § 1961); 18 U.S.C. § 1961(1)

("racketeering activity means (A) *any act or threat involving murder* . . . or *dealing in a*

*controlled substance* or listed chemical (as defined in section 102 of the Controlled Substances

Act), which is chargeable under State law and punishable by imprisonment for more than one

year; (B) any act which is indictable under any of the following provisions of title 18, United

States Code: . . . sections 471, 472, and 473 (*relating to counterfeiting*)") (emphases added).

### c.   As to Defendant Bailey's VICAR Convictions

Defendant Bailey argues the Government presented insufficient evidence to support his

VICAR convictions, specifically arguing there was not sufficient evidence to establish Defendant

Bailey:  (1) was a member of GD at all, let alone during the relevant time period; (2) was part of

the charged conspiracy to murder rival gang leaders; (3) participated in the November 7, 2020

shootings; (4) took any action with an intent to kill has he participated in those shootings;[8] or (4)

did any of those acts in order to increase his position in GD. *See, e.g.*, ECF No. 568 at 3-6, 8-10;

ECF No. 569-1 at 2-9.  The Court addresses each argument in turn.

To sustain a VICAR conviction, the Government must "establish that:  (1) a racketeering

enterprise existed; (2) the enterprise's activities affected interstate commerce; (3) [the defendant]

had a position in the enterprise; (4) [the defendant] committed a violent crime; and (5) [the

defendant] committed the violent crime, as relevant here, 'for the purpose of . . . maintaining or

---

[8] It is ambiguous as to whether Defendant Bailey is challenging the conspiracy to murder rival gang members or attempted murder charges on intent grounds. *Compare* ECF No. 569-1 at 2-3 ("The aforesaid indictment insofar as it pertained to Defendant Bailey essentially alleged affiliation with the 'Folk Nation,' and his participation in a two day conspiracy, the focus of which were two November 7th, 2020 excursions from the Flatbush section of Brooklyn, out to the Flatlands and Canarsie sections of Brooklyn.  The apparent intent was to demonstrate a responsive 'show of force' to unspecified rival gang members who were suspected of instigating the physical theft of a valuable gold and diamond encrusted necklace with which Defendant Jean Fremont had been entrusted (but which was owned by the rap performer 'Bills.'")) *with* ECF No. 606 at 1 ("Similarly, we have assiduously asserted that the government has not proven by the higher reasonable doubt standard that the defendant intended to murder the purported victims in this case, and the evidence does not support the attempted murder counts.").  Because this is ambiguous, the Court addresses both.

increasing position in [the] enterprise.'" *United States v. Arrington*, 941 F.3d 24, 37 (2d Cir.
2019) (quoting 18 U.S.C. 1959(a)) (last alteration in original).  As explained in the prior section,
the Court finds the Government established GD existed as a racketeering enterprise which
affected interstate commerce and the evidence does not preponderate heavily against such a
finding.  The Court therefore turns to the evidence regarding whether Defendant Bailey had a
position in GD and committed violent crimes with the purpose of maintaining or increasing his
position in GD.

     The evidence did not preponderate heavily against a finding that Defendant Bailey had a
position in GD.  The Government argued and presented extensive evidence that Defendant
Bailey had a position in GD, some of which is highlighted in the Government's opposition.  This
evidence includes, *inter alia*:  (1) Williams' testimony that Defendant Bailey was a member of
GD and was specifically identified by his nickname—"Renzo"—on a gang organizational lineup
sent from Britton to Defendant Destine, Tr. 291-92, 314-319; 337-38; GX 19105E;  (2) the
inclusion of Defendant Bailey, again identified by his nickname, on a different gang
organizational lineup in which he was listed as "Chief of Security," GX 19105D; and (3) photos
and videos showing Defendant Bailey, including some with other GD members, utilizing GD
symbology, *see, e.g.*, GX 12434 (photo of a black bandana from Defendant Bailey's Instagram,
with the caption "At this point it not bout the money let see about generational wealth that's
GD");[9] and GX 13325A (photograph of Defendant Bailey with Defendant Battice; Defendant
Bailey is making a pitchfork hand symbol, and Defendant Battice is "dropping the woo").[10]  *See*

---

[9] *See* Tr. 2698-99 (testimony discussing evidence, including reference that this is from the "renzo3XL Instagram
account"); Tr. 2934 (testimony that, according to the headshot board at trial, Renzo3XL is Defendant Bailey's
Instagram handle); Tr. 589 ("Q:  What do you have in your hand?  A:  Black bandana.  Q:  What does that signify?
A:  GD.").
[10] *See* Tr. 2768-69 (testimony discussing GX 13325A and hand symbols); Tr. 404-06 (testimony discussing the
"rake" or "pitchfork" symbol as a GD sign); Tr. 432-33 (testimony discussing dropping the woo as a hand sign used
by individuals in GD to "disrespect our rival gang").

ECF No. 575 at 4-5.  Indeed, in a video from Defendant Bailey's phone from the early morning

hours of November 8, 2020, Defendant Bailey displays three guns while saying, in some and

substance, that he was going to kill, "I swear to God . . . on Folk."  GX 12206C; *see also* Tr.

2908-09 (A: "To the effect: I'm going to kill one of you pussy, something, I swear to God.  On

Folk.").

      While Defendant Bailey objects to utilizing evidence of his associating with GD

members to prove his position in GD, *see, e.g.*, ECF No. 568 at 4, 6; ECF No. 569-1 at 6, such

evidence is admissible to show association with GD "and some of its core members."  *See*

*United States v. Henderson*, 303 F. App'x 30, 36 (2d Cir. 2008) ("Here, the government offered

the [evidence that the defendant was previously in a van with enterprise members from which

shots were fired] as direct proof of [the defendant's] association with 'Murder Unit' and some of

its core members, not as impermissible character evidence.").  That Defendant Bailey moved to

Georgia prior to the shootings charged in this case does not preponderate heavily against a

finding that Defendant Bailey was in GD, particularly in light of the evidence showing that:  (1)

GD operates outside of New York, *see* Tr. 282; (2) Defendant Bailey spent time with Defendant

Battice and at least one other GD member in Georgia, *see* GX 11333; Tr. 2662-63, on which

Defendant Agoro commented "niggas really left me but" followed by four TWIRL emojis, *see*

GX 11333A; Tr. 2663[11]; and (3) Defendant Bailey continued to associate with GD members and

visited New York multiple times, *see* Tr. 3468-70, 3472-74.  In the context of this evidence,

Defendant Bailey's arguments that there was no evidence that Britton communicated with or

referenced Defendant Bailey and that "[n]o other text messages presented at the trial discussed

---

[11] *See also* Tr. 478, 482 (Williams testifying that TWIRL emojis represent GD); *see generally* Tr. 289-91 (Williams testifying that "TWIRL" is essentially a "movement" or a "family" made up of people in the neighborhood; that everyone in No Love City is part of TWIRL but not everyone in TWIRL is part of GD; and that everyone in TWIRL is "at least" an associate of GD).

Bailey's participation in the November 7 shootings," ECF No. 568 at 4, does not preponderate heavily against a finding that Defendant Bailey was a GD member.

The Government further argued and presented evidence supporting Defendant Bailey's (1) membership in the charged conspiracy to murder rival gang members, (2) participation in the November 7 shootings, (3) intention to kill, and (4) desire to increase or maintain his position in GD. *See generally* ECF No. 575 at 4-10. To convict Defendant Bailey of conspiracy to commit murder in-aid-of-racketeering under 18 U.S.C. § 1959(a)(5), the Government needed to establish Defendant Bailey conspired to murder rival gang members for the purpose of increasing or maintaining his position in GD. *See United States v. Reyes*, 157 F.3d 949, 955 (2d Cir. 1998). Under the New York Penal Law provisions charged under Count 10 of the VICAR Indictment— conspiracy to murder rival gang members—the Government had to establish Defendant Bailey, with the intent to cause the death of another person, "agree[d] with one or more persons to engage in or cause" the death of another person. *People v. Washington*, 8 N.Y.3d 565, 570 (2007) (quoting NYPL § 105.15); *see People v. Lendof-Gonzalez*, 36 N.Y.3d 87, 92 (2020) (defining second degree murder under NYPL § 125.25(1)). "[I]t is well settled that '[a] conspiracy consists of an agreement to commit an underlying substantive crime . . . coupled with an overt act committed by one of the conspirators in furtherance of the conspiracy.'" *Washington*, 8 N.Y.3d at 570 (citation omitted). "An agreement to commit a crime may be proven by circumstantial evidence," *People v. Moore*, 223 A.D.3d 1085, 1092 (N.Y. App. Div. 3d Dep't 2024), and "the overt act, which need not be the object crime, provides corroboration of the existence of the agreement," *People v. Ackies*, 79 A.D.3d 1050, 1056 (N.Y. App. Div. 2d Dep't 2010). To prove attempted murder in the second degree, the Government must show that

with intent to kill, "[the person] engages in conduct which tends to effect the commission of such crime." *Lendof-Gonzalez*, 36 N.Y.3d at 92.

With regards to the intent to kill underlying second-degree attempted murder and conspiracy to commit second degree murder, "[i]ntent is rarely proved by an explicit expression of culpability by the perpetrator," *People v. Rouse*, 34 N.Y.3d 269, 274 (2019) (citation and internal quotation marks omitted), and, as such, "intent to commit murder may be inferred from defendant's actions and surrounding circumstances," *Moore*, 223 A.D.3d at 1092 (citation and internal quotation marks omitted).  Indeed, "'circumstantial evidence is as persuasive as direct evidence' with regard to establishing intent to kill." *Jones v. Keane*, 250 F. Supp. 2d 217, 238 (W.D.N.Y. 2002) (quoting *Mallette v. Scully*, 752 F.2d 26, 32 (2d Cir. 1984)).  Therefore, courts interpreting NYPL § 125.25(1) have upheld second degree attempted murder convictions based on the defendant possessing the requisite intent to kill in a multiplicity of circumstances. *See, e.g.*, *Rouse*, 34 N.Y.3d at 274-75 (denying a legal sufficiency challenge to a second degree attempted murder conviction because testimony "that defendant was seen chasing the group of teenagers on foot in advance of the shooting before he stopped, readied the gun at eye level, and fired in their direction" "could have allowed a rational person to reach the conclusion that defendant intended not to warn or to merely scare in shooting the gun, but instead to kill one of those teenagers.").

To hold a defendant liable for a principal's conduct under the charged aiding and abetting statutes, 18 U.S.C. § 2 and NYPL § 20.00, the Government must show the individual "personally engaged in some voluntary act that was specifically connected to the actual perpetrator's misconduct, and in doing so, he intentionally and directly assisted in achieving the ultimate goal of the criminal enterprise," *United States v. Delgado*, 972 F.3d 63, 78-79 (2d Cir. 2020), *as*

20

*amended* (Sept. 1, 2020) (internal quotation marks and citations omitted) (cleaned up) alterations in original). "[J]ust as we have said that a defendant must actually contribute to the success of a crime to qualify as an aider and abettor under 18 U.S.C. § 2, the New York Court of Appeals has interpreted the state's accomplice statute as requiring evidence that a defendant exhibited some calculated or direct behavior that purposefully affected or furthered the substantive crime." *Id.* at 78 (cleaned up). The Court further charged the jury with a *Pinkerton* instruction in this case. *See* Tr. 3879-81; *see also* Tr. 3370-72 (overruling objection to *Pinkerton* charge). "A *Pinkerton* instruction 'informs the jury that it may find a defendant guilty of a substantive offense that he did not personally commit if it was committed by a coconspirator in furtherance of the conspiracy, and if commission of that offense was a reasonably foreseeable consequence of the conspiratorial agreement.'" *Gomez v. United States*, 87 F.4th 100, 109 (2d Cir. 2023) (quoting *United States v. McCoy*, 995 F.3d 32, 63 (2d Cir. 2021), *judgment vacated on other grounds*, 142 S. Ct. 2863 (2022)). In short, "[t]he *Pinkerton* theory of liability deems the defendant to have performed the acts of his co-conspirators." *Id.*

The Government argued and presented extensive evidence that Defendant Bailey joined the conspiracy to murder rival gang members, participated in the November 7 shootings, and acted with intent to kill. *See generally* ECF No. 575 at 4-10. The Government presented evidence that Defendant Bailey was (1) with other shooting participants near the shooter-car Jeep in the late morning of November 7, 2020 and (2) that, while he was standing near the other shooter participants near the Jeep, Defendant Bailey took pictures of a rival gang member's Instagram post on another individual's phone. *See* GX 801, slides 17, 18, 34-35, 41, 46-47; Tr. 3144-49, 3181-82, 3188, 3191-92; *infra* at 26. The Government presented location information for the shooter car (Jeep) traveling from the area where Defendant Bailey was near that car to the

21

location of the first shooting. *See* GX 801, slides 19-20; Tr. 3149-53, 3170-72; *see generally* GX 801, slide 18. The Government presented video evidence of the first shooting, which a Detective testified showed a "swift motion inside" the front seat of the shooter car (Jeep), after which "you see the crowd reacting near the dark -- the black sedan and you see ricochets." *See* GX 6030, file name 1606275938247_frontporch_avi; Tr. 1067, 1074-75. The Government presented location information, corroborated by video evidence, showing that the Jeep travelled from the area of the first shooting to Defendant Thompson's home, and then to a bodega. *See* GX 801, slides 21-22; GX 6039A; Tr. 2004-08; GX 6239; Tr. 1831-39, 1845; *see generally* GX 801, slide 18. The Government presented video evidence showing Defendant Bailey exiting the front passenger seat of the shooter car outside of the bodega, perusing the bodega, purchasing water and gloves, and getting back into the shooter car. *See* GX 6040, file names CH02-2020-11-07-14-47-31.AVI, CH06-2020-11-07-14-45-29.AVI, CH03-2020-11-07-14-43-38.AVI, CH08-2020-1107-14-57-19, and CH02-2020-11-07-14-47-31; Tr. 1167-82 (testimony regarding video evidence). The Government presented cell phone location data, corroborated by video surveillance footage, showing that the shooter car drove from the bodega to Defendant Thompson's residence and then to the location of the second shooting, GX 801, slides 23-26; GX 6239; Tr. 1845-52, 1866-68; that shots were fired from the shooter car, GX 6239; Tr. 1866-69; and the convoy then drove to a gas station, GX 801, slide 26; GX 6239; Tr. 1868-70; GX 6047A; Tr. 1149-66. A picture from the gas station showed an individual in the front seat of the jeep, wearing gloves and black clothing. *See* GX 6047C. After this, the Government presented location data that the shooter car drove from the gas station to Flatbush, *see* GX 801, slide 27, and evidence of Defendant Bailey (and other Defendants) walking together after the shooter car returned to Flatbush. *See* Tr. 1248-60; GX 6010A. Location information for Defendants Agoro, Battice, and Fremont—other

participants in the November 7, 2020 shootings, whether in the shooter car or a decoy car—all track the shooter car's movements. *Compare* GX 801, slides 28-32, *with* Tr. 3176-80 (testimony regarding Defendant Agoro's November 7 location data) *and* Tr. 3179-80 ("Q: So for all of those different times that we looked at over those, that's almost a two-hour period, where was the Agoro location data in comparison to the Jeep location data? A: In the same proximity to the GPS data."); *compare* GX 801, slides 40-44 *with* Tr. 3187-91 (testimony regarding Defendant Battice's location data); *compare* GX 801, slides 45-60 *with* Tr. 3191-99 (testimony regarding Defendant Fremont's location data).[12]

The Government further argued and presented evidence that Defendant Bailey was in a car chase in the early morning of November 8, 2020 which resulted in the disposal of three guns used in the November 7, 2020 shootings. *See, e.g.*, Tr. 1681-82, 1722-35, 2347-50. First, the Government presented evidence of Defendant Bailey wearing dress clothes and carrying a bag containing multiple guns in the evening of November 7, 2020. *See* GX 12206B; Tr. 2906-08. Second, Defendant Bailey's cell phone location information tracked the location information for the vehicle involved in the car crash. *See* GX 801, slides 63-70; Tr. 3202-07; *see also* Tr. 1654-62. Third, Defendant Bailey recorded a video of himself in a car holding three guns at approximately 3:30 A.M. on November 8, 2020, *see* GX 12206C; Tr. 2908-09, in which Defendant Bailey said, "[t]o the effect: I'm going to kill one of you pussy, something, I swear to God. On Folk." Tr. 2909. Fourth, the Government argued that the other individual in the back seat of the car with Defendant Bailey, as reflected in the video, was a man named Devon

---

[12] While defense counsel is correct that the Government did not present cell phone location data for Defendant Bailey's cell phone during the time of the shootings, *see* ECF No. 569-1 at 5, a Government witness testified that (1) there was no outgoing activity or data usage from Defendant Bailey's cell phone during that time period, *see* Tr. 3184-85; GX 801, slide 39; (2) none of the calls made to Defendant Bailey's cell phone during that time period connected, *see* Tr. 3185-87; and (3) possible reasons that, despite Defendant Bailey's phone having received incoming SMS messages, why those messages would not register a location. *See* Tr. 3187; *see generally* Tr. 3187 ("Q: But between 12:36 and 5:12, there's no activity that would generate location data? A: Correct.").

Cummings, who was arrested that night in connection with the car chase. *See* GX 12206C; GX 4786; Tr. 1671-72, 1684. Fifth, the Government presented evidence that three guns were found along the route of the car in the chase. *See* Tr. 1662-67; GX 4789A. Sixth, the Government presented video evidence that a man wearing what appeared to be "a jacket, slacks, and shoes" hopped a fence and ran away from the scene shortly after the car crashed. *See* Tr. 1687-91; GX 6902, file names 1605361910791_CH03-202011 and 1605361883637_CH04-202011. The Government argued that that man was Defendant Bailey in his tuxedo. *See* Tr. 3543. Seventh, the Government presented evidence that two of the guns found along the route of the car were used in the November 7, 2020 shootings. *See* Tr. 1722-35; Tr. 2347-50.

Further, the Government introduced a 2021 video from Defendant Battice's Instagram account showing car keys and ammunition, *see* GX 13440; Tr. 2933-34, arguing this post was a reference to the November 7, 2020 shootings, Tr. 3597. Defendant Battice "tagged," or identified, Defendants Bailey, Fremont, and Thompson in the video—the four people alleged to have been in the shooter car that day. *See* GX 13440; Tr. 2933-34, 3597.

The Court finds that the evidence presented at trial, including that highlighted above, establishes that Defendant Bailey conspired to murder rival gang members and participated in the November 7, 2020 shootings with an intent to kill. *See also supra* at 10-12, 15; *infra* at 25-28. The Court agrees with the Government that this evidence was sufficient to show Defendant Bailey's participation as a direct perpetrator, an aider or abettor, or under the charged *Pinkerton* theory of liability. At a minimum, in light of the totality of the evidence, the evidence does not preponderate heavily against Defendant Bailey's VICAR convictions such that allowing the verdicts to stand would be a manifest injustice. Indeed, this is notwithstanding Defendant Bailey's argument that the Government did not present direct evidence tying Defendant Bailey to

24

the firearms or placing him at the relevant locations. *See, e.g.*, ECF No. 568 at 5; ECF No. 569-1 at 4-6. Contrary to Defendant Bailey's arguments, the evidence showed significantly more than his "mere presence."[13] *See* ECF No. 569-1 at 6; ECF No. 598 at 7-8.

Defendant Bailey further argues that, even assuming *arguendo* he did commit the offenses underlying the VICAR counts, there was insufficient evidence to show that Defendant Bailey did so for the purpose of increasing or maintaining his position in the enterprise. *See* ECF No. 568 at 8-10; ECF No. 569-1 at 2.

The Court disagrees—and at minimum, the evidence did not preponderate heavily against the finding. Per *United States v. Pagett*:

> Under 18 U.S.C. § 1959(a), the Government must prove, as relevant here, that a defendant murdered an individual in violation of state or federal law "for the purpose of ... maintaining or increasing position in an enterprise engaged in racketeering activity." This motive element is satisfied if "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992). The Government need not prove that "maintaining or increasing position in the RICO enterprise was the defendant's sole or principal motive." *Id.*

---

[13] Defendant Bailey points the court to Chief Judge Margo Brodie's recent decision in *United States v. Lucas*, 19-CR-467, 22-CR-290, 2023 WL 4209628 (E.D.N.Y. June 26, 2023) (Brodie, C.J.) in support of his contention that the Government did not establish an intent to kill beyond a reasonable doubt. *See* ECF No. 606. The Court finds this case inapposite. First, as Defendant Bailey acknowledges, the *Lucas* decision was in the context of whether to apply the U.S.S.G. attempted murder cross-reference enhancement during a sentencing, as opposed to a Rule 33 motion pertaining to a jury's conviction of attempted murder. *Id.* As opposed to the preponderance of the evidence standard used in determining whether to apply to attempted murder cross-reference, sufficiency of the evidence challenges under Rule 33 are governed by the preponderates heavily against a verdict standard. Those two standards are meaningfully distinct. *Compare Lucas*, 2023 WL 4209628 at *4 ("Because the Court can equally infer that Lucas intended to frighten or injure the victim, the record before the Court is insufficient to support the conclusion that Lucas had specific intent to kill the victim.") *with Archer*, 977 F.3d at 195 ("[T]he mere fact that competing inferences existed does not compel a finding that the evidence preponderated heavily against the verdict.") As such, the Court does not rely on *Lucas* in reaching its decision. Moreover, in *Lucas* the only evidence supporting the specific intent to kill was that the defendant shot at a victim from a distance. *Lucas*, 2023 WL 4209628 at *2-4. By contrast, as outlined above, there was extensive evidence supporting that Defendant Bailey intended to kill one or more individuals during the second shooting. Indeed, as Chief Judge Brodie noted in her opinion, "[a]t a jury trial, there would be presumably more evidence from which to conclude that the defendant had specific intent to kill." *Lucas*, 2023 WL 4209628 at *4 n.4.

21-1632-CR, 2022 WL 2057572, at *1 (2d Cir. June 8, 2022); *see also United States v. Pimentel*, 346 F.3d 285, 295-96 (2d Cir. 2003).

In the instant case, the Government argued and presented evidence that a chain belonging to NLC member and leader "Bills" was stolen between the evening of November 6, 2020 and the morning of November 7, 2020. *See* GX 9024D (photo of Defendant Fremont wearing the chain in a music video filed on November 6, 2020)[14]; GX 21006[15] (Instagram post uploaded on November 7, 2020 by Mikey Bands showing an individual with the chain, captioned "niggas should've took the wheel chair too" with an emoji); Tr. 2860-62 (describing Bands' Instagram, which includes (1) a reference to rival gang territory in Bands' "about me" section and (2) an individual making an anti-GD comment on a photo of Bands)[16]. The Government then presented evidence showing that Defendant Bailey had two photos of one of the rival gang members' Instagram posts on his phone at approximately 12:00 Noon on November 7, 2020. *See* GXs 12205B, 12205C, and 12205; *see also* Tr. 2882-85.

As the Government outlines, the evidence supported the finding that Defendant Bailey committed these crimes because he knew these actions were "expected of him by reason of his membership in" GD and did so "in furtherance of" his GD membership. *See Concepcion*, 983 F.2d at 381; *see generally* ECF No. 575 at 6. First, Williams testified that, within GD, there was an expectation that individuals are supposed to "retaliate in violence," specifically "shooting," to kill people who "disrespect[] the gang." Tr. 426-27; *see also* Tr. 364-66 (Williams testifying that committing shootings and murders on behalf of the GD increases your status within the gang);

---

[14] *See* Tr. 2845-58 (discussing evidence supporting that the music video was filmed on November 6, 2020).
[15] *See* GX 21006A (metadata showing GX 21006 was uploaded on November 7, 2020).
[16] *See* Tr. 427 (Williams testifying that "GDK" means "Ganster Discipline Killer" and is an indication that someone is "against" GD,meaning: "they don't "); Tr. 597-98 (Williams testifying that Crips, a rival gang, is in Caton).

Tr. 598-99 ("Q:  In the eyes of members of GD, did that violence make the gang look better?  A: Yes.  Q:  Did the violence you committed make you look better in the eyes of GD?  A:  Yes."). Williams explained there are a number of ways to disrespect the gang: "by words, you could do it by assaulting one of us, shooting at one of us, anything in that nature."  Tr. 427.  Williams testified even more specifically about the expectations surrounding any disrespect to NLC leader Bills in particular.  Tr. 309-10.  Because Bills is in a wheelchair, GD members are "overprotective of him."  *Id.*.  It was expected "if somebody threaten[ed] [B]ills or either try to do anything to him, we must retaliate" with "violence," specifically "shootings."  Tr. 310. Indeed, Williams testified if Bills' chain was stolen, it would provoke "an extreme retaliation." *See* Tr. 662.

Second, the Government argued and presented evidence Defendant Bailey was the gang's "Chief of Security."  *See* GX 19105D.  As Williams explained, having a security position in the gang included ensuring "nobody disrespect the gang" and that "you stand on business," meaning "[w]hether you by yourself or outside with the gang, you can't let nobody disrespect you.  You can't let nobody disrespect" GD or a "team" which has overlapping members with GD.  Tr. 313-14; *see also* Tr. 287-88.  Williams testified he thought he received a security position because:

> [I]n every situation I stood tall.  Wherever I was at, I didn't let anybody disrespect me or nobody I was around.  I was never a person that tuck their tail.  Q:  What did you show?  What did you do to show that you are not a person who tucked your tail?  A:  Any situation I got into, I always resorted to violence.

Tr. 314.

Taken together, this evidence does not preponderate against a finding that Defendant Bailey committed these offenses "maintain[] or increase[]" his position in GD.  *See* 18 U.S.C. § 1959(a).

C. Other Arguments

a. Prosecutorial Misconduct During Summation

Defendant Bailey argues the Government "improperly 'testified' and vouched during [its] summation to material facts that were not in evidence." ECF No. 568 at 6; *see also* ECF No. 598 at 11-12. Specifically, Defendant Bailey argues "[a]lthough no government witness testified that Devon Cummings was in a car next to Bailey on the morning of November 8th . . . or that the person seen jumping over a fence in the vicinity of 40th Street where the Chevrolet crashed, was Lorenzo Bailey, the AUSA improperly provided that 'testimony' in her summation." ECF No. 568 at 6; *see also* ECF No. 598 at 11; *see generally* Tr. 3542-43. Based on this, Defendant Bailey requests the Court vacate the conviction. *See* ECF No. 598 at 11 ("Reversal of a conviction is appropriate where the prosecutorial error is prejudicial and infects the trial with unfairness."). Defendant Bailey asserts this "'testimony' was not harmless because [the AUSA's] statement linked Bailey to Devon Cummings," and to the discarded guns, on which "Cummings' DNA was detected." *Id.* at 12. Defense counsel asserts this allegedly improper testimony is made more important because "Bailey's DNA was not found on the purportedly discarded guns even though the video revealed Bailey handling guns without gloves." *Id.*

The Government firmly rejects Defendant Bailey's assertion that this was improper prosecutorial vouching or testimony, maintaining "[t]hese arguments were firmly based in the evidence." ECF No. 575 at 10. In support, the Government first notes the statement regarding Defendant Bailey sitting next to Cummings in the car "was based on a video of Bailey in the car that was in evidence, where Cummings's face and glasses are visible." *Id.* (citing: (1) Tr. 3542 discussing the Government video exhibit at issue, GX 12206C and (2) GX 4786, which is a photograph of Cummings taken on the same day as the car crash). Second, the Government

explains "[t]he argument that Bailey was the person seen fleeing the scene was based on location data for Bailey's phone showing him moving along with the car and then making calls from near the scene of the crash and video showing that the person fleeing was wearing the same clothes that Bailey had been wearing earlier and was of the same shape and stature as Bailey." *Id.* (citing Tr. 3539-44, discussing Government exhibits). Indeed, the Government made similar arguments in response to defense counsel's earlier motion for a mistrial based on improper prosecutorial testimony. *See* Tr. 3792-94. The Government maintains these were proper "arguments about conclusions to draw from the evidence," and , in light of the Court's instructions to the jury that the parties' arguments were not evidence, there was no risk of prejudice. ECF No. 575 at 10.

"It is well established that the Government 'has broad latitude in the inferences it may reasonably suggest to the jury during summation.'" *United States v. Coplan*, 703 F.3d 46, 87 (2d Cir. 2012) (quoting *United States v. Edwards*, 342 F.3d 168, 181 (2d Cir. 2003)). *Coplan* outlines the Second Circuit's extremely high bar to overturn a conviction based on an improper summation:

> As a general matter, a defendant asserting that a prosecutor's remarks warrant a new trial "'faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial.'" *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) (quoting *United States v. Locascio*, 6 F.3d 924, 925 (2d Cir. 1993) (alterations omitted)); *see also United States v. Whitten*, 610 F.3d 168, 202 (2d Cir. 2010) ("We will reverse on the ground of prosecutorial misconduct only if that misconduct caused substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." (internal quotation marks omitted)). "In considering whether inappropriate remarks rise to the level of prejudicial error, we examine 'the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct.'" *United States v. Gansman*, 657 F.3d 85, 96 (2d Cir. 2011) (quoting *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir.

2010)).

*Id.* at 86.  Indeed, "[i]t is a 'rare case' in which we will identify a prosecutor's summation

comments, even if objectionable, as so prejudicial as to warrant relief from conviction." *Aquart*,

912 F.3d at 27 (quoting *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992)).

 The Court agrees with the Government:  the AUSA's statements in summation were

permissible argument.  The Court finds there was no misconduct (let alone severe misconduct)

on the part of the AUSA in making those statements, as her comments that Cummings was in the

car with Defendant Bailey and that Defendant Bailey fled the scene in a tuxedo were firmly

rooted in the evidence presented at trial.  *See* ECF No. 575 at 10 (describing evidentiary bases

for AUSA's arguments:  GX 12206C, GX 4786, GX 801, GX 6003A, GX 6003B, GX 6902, GX

12206B).  Such statements certainly do not "so infect[] the trial with unfairness as to make the

resulting conviction a denial of due process." *Coplan*, 703 F.3d at 86. *see generally* ABA

Standards for Criminal Justice 3-6.8(a) (4th Ed. 2017), *available at*

https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEditi

on/ (last visited Mar. 28, 2024) (explaining "[i]n closing argument to a jury," "[t]he prosecutor

may argue all reasonable inferences from evidence in the record, unless the prosecutor knows an

inference to be false.")

 Moreover, the Court holds, even if these statements were improper, any risk of prejudice

to Defendant was addressed by the Court's jury charge.  The Court instructed the jury

"[a]rguments by lawyers are not evidence because the lawyers are not witnesses," "[w]hat they

have said in their . . . summations is intended to help you understand the evidence to reach your

verdict," and that "if your recollection of the facts differs from the lawyers' statements, it is your

recollection which controls." Tr. 3843; *see also United States v. Kenner*, No. 21-2289, 2023 WL

4692508, at *5 (2d Cir. July 24, 2023), *cert. denied*, 144 S. Ct. 616 (2024) (listing jury

instruction that attorney statements in summations are not evidence as one of the reasons that

potential Government misrepresentation of testimony did not substantially prejudice the

defendant).

b.  Sixth Amendment Confrontation Clause

Defendants argue their Sixth Amendment right to confront and cross-examine adverse

witnesses was violated through the admission of (1) a GD "organizational chart" retrieved from

the contraband prison cell phone of NLC leader Ronald Britton,[17,] and (2) shooting victims'

medical records regarding their injuries, given the absence of Britton, the shooting victims, or

medical personnel at trial. *See* ECF No. 569-1 at 9-14; ECF No. 597 at 4-5; ECF No. 598 at 7.[18]

Defendants argue Britton's organizational chart was a "testimonial communication[]"

within the Sixth Amendment's Confrontation Clause and Britton therefore should have been

subject to cross-examination. ECF No. 597 at 4-5 (citation and internal quotation marks

omitted); *see also* ECF No. 569-1 at 9-12. Defendants argue the Government used the GD

organizational chart downloaded from Britton's phone and purportedly prepared by Britton,

which listed Defendant Bailey as Chief of Security, to establish "the existence of an 'enterprise,'"

and "Lorenzo Bailey's alleged position therein, even in the absence of Britton's testimonial

---

[17] This chart can be found at GX 19105D. The Government also admitted a different lineup, or "[a] list of names of member's that's in the gang and their position," Tr. 317, through Williams' testimony. *See* GX 19105E; Tr. 317-18. GX 19105E is directly cited, by exhibit number, in the sworn affidavit of Britton submitted with ECF No. 597. *See* ECF No. 597 at 10. GX 19105E is also the list referenced by Special Agent Elisma at Tr. 2952-58, cited by defense counsel to support the proposition "that the Britton list was 'unreliable.'" *See* ECF No. 598 at 6. The Court's findings and holding regarding GX 19105D also apply to GX 19105E.

[18] Defendants mention a third example of evidence being admitted in violation of their Sixth Amendment rights: "[t]he email, and text message exchanges, by Derryck Thompson commenting upon the November 7th shooting." ECF No. 569-1 at 10. However, as Defendants make no arguments regarding those communications, the Court will not speculate as to what those arguments might have been and does not address these messages.

unavailability." ECF No. 597 at 4.[19]  Defendants contend this "highly individualized (and fact

specific) statement[]" "lack[ing] any of the non-testimonial characteristics of the business

records of business or enterprise," *id.* at 5, "[a]t best, . . . constituted the unreliable ruminations

of a sentenced federal prisoner" and was "delusional" at worst, and Defendants should therefore

have had the opportunity to cross-examine Britton, the declarant, ECF No. 569-1 at 11.

Defendants further contend this chart was inadmissible as a co-conspirator statement under

Federal Rule of Evidence 801(d)(2)(E) because "there was no *prima facie* evidence that Ronald

Britton was both a member of the charged conspiracy, or that the declaration was both (a) in the

course, and (b) in the furtherance of the conspiracy." ECF No. 597 at 5 (citing *Bourjaily v.*

*United States*, 483 U.S. 171, 175 (1987)).

Defendants further argue the admission of "hospital records . . . which contained hearsay

conversations between the shooting victims and medical personnel addressed to their injuries and

medical treatment, and the written observations of hospital staff who were never produced for

examination" violated their rights under the Confrontation Clause. ECF No. 569-1 at 12-13; *see*

*also* ECF No. 597 at 5 (analogizing these records to "an autopsy report generated by the Medical

Examiner's Office (or DNA analysis)" to argue the hospital personnel, medical providers, or

victims should have been produced for examination). Defendants contend these medical records

were testimonial under the Confrontation Clause because, as opposed to "the type of business

records containing recorded routine entity transactions," they "were highly individualized (and

fact specific) statements which offered the truth of their contents." ECF No. 597 at 5; ECF No.

569-1 at 13 ("Medical records, by contrast, are patient-specific, and reflect both the medical

condition perceived, and the patient-specific treatment provided. . . . Whether 'business records'

---

[19] This organizational chart also lists "Juno" as a member of the Steering Committee. "Juno" is Defendant
Fremont's nickname. Tr. 293.

involve areas of significant medical expertise, the notion that the records are routine business records is no longer realistic. This is particularly the case where the charges (a) attempted murder, and (b) felonious assault involve the assessment and treatment of injured patients."). Because these were testimonial under the Confrontation Clause, Defendants argue they had the constitutional right to cross-examine and confront the shooting victims and city hospital personnel. *See* ECF No. 569-1 at 13-14.

The Government rejects Defendants' contention that their rights under the Confrontation Clause were violated, arguing the GD organizational chart and victims' medical records both constitute non-testimonial statements that do not implicate the Confrontation Clause. ECF No. 575 at 10; ECF No. 635 at 1-2.

The Court agrees with the Government:  neither the organizational chart nor the medical records implicate the Confrontation Clause. As explained in *Washington v. Griffin*, 876 F.3d 395, 404 (2d Cir. 2017):

> [T]he Confrontation Clause prohibits admission at trial of out-of-court testimonial statements against a criminal defendant unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him. *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354. The *Crawford* Court, observing that there are various ways to define "testimonial," declined to settle on a precise articulation of the term, *id.* at 51-52, 68, 124 S.Ct. 1354, resulting in a "steady stream of new cases," *Williams*, 132 S.Ct. at 2232. Most recently, the Supreme Court has noted that "under our precedents, a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial"—that is, in light of all the relevant circumstances, viewed objectively, the statement was made or procured with a primary purpose of "'creat[ing] an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, --- U.S. ----, 135 S.Ct. 2173, 2180, 192 L.Ed.2d 306 (2015) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011)). And even then, the Court observed, the Clause does not "bar[] every statement that satisfies the 'primary purpose' test," pointing specifically to out-of-court statements "that would have been admissible in a criminal case at the time of the founding." *Id.*

33

The only statements which trigger the Sixth Amendment's right of confrontation are those which are testimonial. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309-11 (2009). Statements made in furtherance of a conspiracy are generally not testimonial under the confrontation clause. *See Crawford v. Washington*, 541 U.S. 36, 56 (2004) ("Most of the hearsay exceptions covered statements by that their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy."); *Giles v. California*, 554 U.S. 353, 374 n.6 (2008) (noting that "an incriminating statement in furtherance of [a] conspiracy would probably never be[] testimonial"); *United States v. Logan*, 419 F.3d 172, 178 (2d Cir. 2005) (noting that "[i]n general, statements of co-conspirators in furtherance of a conspiracy are non-testimonial," before finding that the false alibi statements made to police in furtherance of a conspiracy were testimonial); *see generally Bourjaily*, 483 U.S. at 181-84. Similarly, business records "are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez-Diaz*, 557 U.S. at 324; *cf. Garlick v. Lee*, 1 F.4th 122, 131 (2d Cir. 2021) ("While a document kept in the regular course of business ordinarily may be admitted at trial despite its hearsay status, such a document may not be admitted without confrontation if the regularly conducted business activity is the production of evidence for use at trial.") (citation and internal quotation marks omitted).

The Britton GD organizational chart was not a testimonial statement and its admission therefore did not violate Defendants' Sixth Amendment right of confrontation. Even without accounting for the generally non-testimonial nature of co-conspirator statements made in furtherance of a conspiracy, the Britton chart is non-testimonial on the facts of this case. This

34

chart was found on a contraband cell phone in Britton's prison cell. *See* Tr. 1402-03, 2611, 2624-25; *see also* Tr. 529; S-14. Britton's cell phone also contained numerous messages between Britton and other GD members through which Britton continued to operate the gang. *See* GX 19104 (extract of Britton's phone showing hundreds of pages of messages); *see, e.g.*, Tr. 2612-2627. Indeed, Britton used this phone to send a different organizational chart to another gang member. *See* Tr. 2615-17 (discussing GX 19105E). Williams testified that Britton, who gave out positions of authority in the gang, created this second lineup to show what Britton "wanted done" and "the people [Britton] wanted [sic] position and authority at the time," after which he sent this second lineup to at least one other person in the gang. *See* Tr. 312-14, Tr. 316-19. Williams explained that understanding gang hierarchy is important: "it's basically for structure." Tr. 319. Given the utility of these types of organizational charts to the gang and how Britton used this phone to operate the gang, it strains credulity that this chart was made "with the 'primary purpose of creating an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, 576 U.S. 235, 250-51 (2015) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). As such, the admission of the chart did not violate Defendants' Sixth Amendment right to confront and cross-examine adverse witnesses.

The determination that the chart is non-testimonial is further augmented by the Court's determination the chart was properly admitted as a non-hearsay statement under Federal Rule of Evidence 801(d)(2)(E).[20] Rule 801(d)(2)(E) provides that statements offered against an opposing party "made by the party's coconspirator during and in furtherance of the conspiracy" are admissible non-hearsay. "[A] district court may admit an out-of-court declaration that would

---

[20] Defendants appear to concede this point in one of their submissions. *See* ECF No. 637 at 1 ("We recognize that statements allegedly made by an alleged co-conspirator (a) in the course of and (b) furtherance of the charged conspiracy do not implicate the Sixth Amendment 'right of confrontation'.") (internal citation omitted).

otherwise be hearsay if it finds by a preponderance of the evidence (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012) (citation and internal quotation marks omitted).

The GD organizational chart was properly admitted under Rule 801(d)(2)(E) as statements made by a co-conspirator "during the course of and in furtherance of the conspiracy to operate the GD racketeering enterprise." *See* ECF No. 635 at 2. While Defendants contest the chart's admission under Rule 801(d)(2)(E) because Britton was "neither a charged co-conspirator, nor were his statements in any discernible <u>furtherance of the conspiracy charged in the indictment</u>," ECF No. 637 at 1, "[i]t is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment." *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979); *see also Coppola*, 671 F.3d at 246 ("[T]he objective of the joint venture need not be any particular crime charged in the indictment.") (internal quotation marks and citation omitted); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999) ("The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment."). Instead, "a preponderance of the evidence must demonstrate a common agreement to achieve a particular objective in furtherance of which the out-of-court statement is made." *Coppola*, 671 F.3d at 246. In this case, the Britton lineup was properly admitted as a co-conspirator statement made in furtherance of the conspiracy to operate

the GD racketeering enterprise under Fed. R. Evid. 801(d)(2)(E).[21,22] Therefore, the admission of the Britton organizational chart did not violate the Confrontation Clause, and the Court declines to exercise its Rule 33 authority.

Following Defendants' reply briefing, Defendant Bailey filed letters pointing the Court to *Samia v. United States*, 599 U.S. 635 (2023), *see* ECF No. 600 at 1,[23] *United States v. Kersee*, 86 F.4th 1095 (5th Cir. 2023), *see* ECF No. 649 at 1, and *People v. Ortega*, 40 N.Y.3d 463 (2023), *see* ECF No. 723, which Defendant Bailey argues support the argument that the Britton organizational chart violated Defendants' rights under the Confrontation Clause. These claims lack merit. *Samia* involved a confrontation clause challenge to the admission of a plainly testimonial "nontestifying codefendant's confession" under *Bruton v. United States*, 391 U.S. 123 (1968). 599 U.S. at 639-40; *see also id.* at 643-44 ("Because Stillwell's formal, Mirandized confession to authorities, which the Government sought to introduce at trial, is testimonial, it falls within the [Confrontation] Clause's gambit."). *Kersee*, a Fifth Circuit case, is similarly inapplicable, as it pertains to a

---

[21] In a supplemental letter to the Court, Defendants assert that the Court did not make a conspiracy finding under *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969). *See* ECF No. 637 at 2. Under *Geaney*, "the judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances." 417 F.2d at 1120; *but see* F.R.E. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court *is not bound by evidence rules*, except those on privilege."). In this Circuit, "where the record indicates it to be appropriate, an implicit *Geaney* ruling can be inferred in the trial judge's decision to receive the evidence and to deny a directed verdict of acquittal on the conspiracy charge." *United States v. Perez*, 702 F.2d 33, 36 (2d Cir. 1983). Such a finding was clearly made in this case. *See* Tr. 2800 ("Obviously, I have let this material in. So you know where my thinking is at this point certainly . . . ."); Tr. 3280-82 (denying Rule 29 motion "to dismiss all counts for insufficient evidence as to each element of each charge"); Tr. 3495 (denying Rule 29 motion "to dismiss all the counts of the indictment against Lorenzo Bailey based upon all the evidence; both the cross-examination during the government's case and the defense case").

[22] The Court rejects Defendant Bailey's argument that his moving to Georgia reflected his withdrawal from any such conspiracy, particularly in light of the evidence that Defendant Bailey traveled back to New York, GD operates in more than just New York, and other GD members and associates met with Bailey in Georgia. *See supra* 13, 18-19; *see also United States v. Jones*, 27 F.3d 50, 51 (2d Cir. 1994) ("In order to demonstrate withdrawal from a conspiracy, the defendant has the burden of proving some act that *affirmatively established that he disavowed his criminal association with the conspiracy* . . . and that he communicated his withdrawal to the co-conspirators.") (internal quotation marks and citation omitted) (emphasis added).

[23] Defendant Bailey's letter mistakenly refers to "*Sapian v. United States*" instead of *Samia v. United States*. ECF No. 600 at 1. The Court analyzes Defendant Bailey's arguments in relation to the latter.

revocation of supervised release hearing wherein the Confrontation Clause does not apply.  86 F.4th at 1098.

In *Ortega*, the New York Court of Appeals determined that the autopsy reports at issue were testimonial because they were "solemn declarations or affirmations made for the purpose of establishing or proving some fact, namely the homicidal nature of these victims' deaths" and "created under circumstances which would lead an objective witness reasonably to believe that the statements would be available for use at trial," 40 N.Y.3d at 474-75 (cleaned up)—a far cry from communications between gang members which were not prepared in relation to an open police investigation or required to be turned over to prosecuting authorities.  The *Ortega* court further held that the admission of those autopsy reports without the opportunity to cross-examine the preparer was harmless error.  *Id.* at 478-79.  Moreover, the Court finds that, similar to the autopsy reports in *Ortega*, any error in admitting the chart in the instant case was harmless because "the evidence of [Defendant]'s guilt was overwhelming" and any error in admitting the chart "did not contribute to defendant's conviction.  *Id.*

The Court also rejects Defendants' argument that the admission of victims' medical records[24] violated their Confrontation Clause rights.  First, the *Melendez-Diaz* Court expressly stated that "medical reports created for treatment purposes. . . would not be testimonial under our decision today."  557 U.S. at 312 n.2.  The Court rejects Defendants' assertions that these medical records, simply because they are individualized, were created with "the primary purpose of creating a substitute for out-of-court testimony."  *Clark*, 576 U.S. at 251 (internal quotation marks and citation omitted).

---

[24] *See* GXs 401, 402, 403, admitted and cited in the trial record as GXs 401-A, 402-A, and 403-A.

Second, these medical records were properly admitted under Federal Rule of Evidence 803(6) as business records. "Medical records constitute hearsay but may, with proper foundation, 'be admi[tted] under Federal Rule of Evidence 803(6), provided they are prepared in the regular course of business, near the time of occurrence, by a person with knowledge and are properly authenticated.'" *Bermudez v. City of New York*, 15-CV-3240, 2019 WL 136633, at *10 (E.D.N.Y. Jan. 8, 2019) (Matsumoto, J.) (quoting *Hodges v. Keane*, 886 F. Supp. 352, 356 (S.D.N.Y. 1995) (Sotomayor, J.)) (alteration in original); *see also Brady v. Foodliner Inc.*, 15-CV-4566, 2022 WL 1624040, at *3 (E.D.N.Y. May 21, 2022) (Gonzalez, J.) ("Courts in the Second Circuit regularly admit medical records as evidence pursuant to Federal Rule of Evidence 803(6), the business records exception to the hearsay rule.") (citation and internal quotation marks omitted). These medical records were properly admitted as business records under Federal Rule of Evidence 803(6). *See* GXs 401, 402, and 403 (containing certification of record from hospital health information management departments certifying that the medical record "is in the custody of and is the full and complete medical record of the condition, act, transaction, occurrence or event" on the relevant date concerning the relevant patient, noting that "this medical record was made in the Regular Course of business of this Institution and it is in the Regular Course of business of this Institution to make such medical record, and such medical record was made at the Time of the Condition, Act, Transaction, Occurrence or Event within reasonable time thereafter."); Tr. 3094-95, 3104-05 (admitting GX 401-A, 402-A, and 403-A as business records under Fed. R. Evid. 902(11) and (13) without objection).

As such, the admission of these medical records did not violate the Confrontation Clause, and the Court declines to exercise its Rule 33 authority. Moreover, the statements and observations of shooting victims and medical personnel in the medical records are admissible

hearsay statements as statements made for the purpose of medical diagnosis or treatment under Rule 803(4). *See id.* ("A statement that: (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause.").

### c.  Giglio

#### i.  Legal Standard

In *Giglio v. United States*, the Supreme Court held the prosecution's obligation to disclose *Brady* material extends to evidence that may be used to impeach a witness. 405 U.S. 150, 153-55 (1972). That obligation, however, mandates only the disclosure of *material* impeachment evidence; "the prosecutor is not required to deliver his entire file to defense counsel." *United States v. Bagley*, 473 U.S. 667, 675 (1985) Evidence is material, and therefore must be disclosed, only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011) (quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999)) (internal quotation marks omitted). "Undisclosed impeachment evidence is not material . . . when, although 'possibly useful to the defense,' it is 'not likely to have changed the verdict.'" *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998) (quoting *Giglio*, 405 U.S. at 154). Indeed, "where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or is subject to extensive attack by reason of other evidence, the undisclosed evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial." *Persico*, 645 F.3d at 111.

#### ii.  Britton Investigative File

Defendants argue the Government's failure to "turn over the B.O.P. investigative file generated by the discovery of a contraband cell phone during a jail search" violated the Government's *Giglio* obligations by "unfairly render[ing]" Britton, the alleged writer of the organizational charts discussed above, unimpeachable.  ECF No. 569-1 at 11; *see also* ECF No. 597 at 6 ("We contend that the evidence clearly suggests that Government 'consciously avoided' learning the existence of a B.O.P. Incident Report and inmate disciplinary file and its contents, even though impeachment of a declarant is legally sanctioned.").  Defendant Bailey's counsel later notified the Court they filed a Freedom of Information Act ("FOIA") request with the BOP and had yet to receive any of the following materials:  "(a) incident report regarding the recovery of the cell phone, (b) seizure paperwork, or (c) disciplinary action report attendant to the Bureau of Prisons [sic] seizure of the phone."  ECF No. 618 at 1; *see also* ECF No. 618 at 3 (FOIA request, requesting "production of Britton's statements, and the investigation's disciplinary action (if any).").  Defendants contend these materials were "testimonially 'material' by any legal standard."  ECF No. 597 at 6.  While in a request similar in substance but separate from his motion to compel, Defendant Bailey acknowledged the Government "provided us with all the documents in the [its] possession relating to the seizure of the 'Britton cell phone'" in response to their request for "documents related to the discovery of the Britton cell phone and any charges or discipline by the BOIP [sic] against Mr. Britton," Defendant Bailey also states it is unknown "what other records the BOP possesses relative to this issue."  ECF No. 685-1 at 1; *see also id.* at 2.  During trial, the Government stated it had not and did not intend to request the BOP "make sure that all of the materials relating to the investigation following the contraband have been turned over."  *See* Tr. 2797-2798.  The Court has previously denied Defendant Bailey's requests to (1) have the Government direct the F.C.I Fort Dix Warden produce "the B.O.P. file related to

the discovery of inmate Ronald Britton's illegal cell phone, and the B.O.P.'s investigation of this contraband smuggling episode (to the extent that one was conducted)," *see* ECF No. 521 at 2 (during trial), and (2) so-order a subpoena requiring the BOP to "produce[] all records pertaining to the recovery of a cell phone purportedly used by the unindicted conspirator Ronald Britton," *see* ECF No. 685-1 at 1 (post-trial). ECF No. 522; Feb. 25, 2024 order denying ECF No. 685.

The Court rejects Defendants' argument that the Government violated its *Giglio* obligations by failing to turn over materials related to the recovery of the Britton cell phone. First, the Government has represented it turned over all materials in its possession related to the Britton cell phone. Tr. 2796; ECF No. 685-1 at 1. Indeed, the Government produced two of the three items Defendant Bailey's counsel previously claimed it was still waiting for from the BOP: the incident report pertaining to the cell phone's seizure and paperwork related to that seizure. *Compare* ECF No. 618 at 1 (Defendant Bailey's letter raising issues regarding the BOP's FOIA response) *with* 3500-JSO-1 (Incident Report) *and* 3500-JSO-2 (Chain of Custody Log pertaining to the March 14, 2021 seizure of the Britton cell phone); *see generally* ECF No. 635 at 2. As such, the only specific item identified by Defendants that has yet to be produced is a "disciplinary action report attendant to the Bureau of Prisons [sic] seizure of the phone." ECF No. 618 at 1; *see also* ECF No. 685-1 at 2 (noting that "[w]e don't know whether any type of administrative hearing was conducted" or "whether other records exist that had not been provided to the government in this case.").

Even assuming *arguendo* that (1) the Government had an obligation to seek out further records regarding any disciplinary action or administrative hearing from the BOP[25]; (2) these

---

[25] As my colleague Judge Kiyo Matsumoto explained in *United States v. Rivera*, 13-CR-139, 2015 WL 1540517, at *2 (E.D.N.Y. Apr. 7, 2015) (Matsumoto, J.):

materials contain the presumably hoped-for "statement or at least an opportunity to speak by Ronald Britton," Tr. 2794; and (3) that such evidence even exists[26], this evidence is "not likely to have changed the verdict" and would therefore not be material for *Giglio* purposes. *See Avellino*, 136 F.3d at 257. As detailed above, the Government presented extensive evidence of Defendants' guilt in this case. To the extent Defendants are seeking statements from Britton denying he was an NLC leader, that the cell phone belonged to him, that he authored the organizational charts at issue, or that the organizational charts at issue were in fact true, the Court finds it unlikely such statements would have swayed the jury to change their verdict. Indeed, according to the investigation portion of the Incident Report, Britton only said "[n]othing to say." 3500-JSO-1 at 6. Furthermore, at trial, defense counsel attacked Britton's credibility, whether the phone was in fact Britton's, and the veracity of the organizational charts at GXs 19105D and 19105E. *See, e.g.*, Tr. 1405-11, 2952-62, 3751. Even if further investigative files existed and they contained statements from Britton denying the phone was his or that he was a member of GD, or even that Britton was cooperating with the BOP in some way and received benefits therefrom,[27] the Court finds any such statements would have been immaterial under *Giglio*

---

Although an individual prosecutor has "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case," such as the police, *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the scope of the prosecutor's duty to obtain information from other agencies, such as departments of correction, is dependent on the agency's involvement with "the investigation or trial" of the defendants. *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (citing *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993), *cert. denied*, 511 U.S. 1070 (1994)). The Second Circuit has made clear with regard to *Brady* that "the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require ... a monolithic view of government, that would condemn the prosecution of criminal cases to a state of paralysis." *Avellino*, 136 F.3d at 255 (internal quotations and citations omitted).

[26] *See* ECF No. 618 at 3 (FOIA request for "production of Britton's statements, and the investigation's disciplinary action (*if any*).") (emphasis added).

[27] Defendant Bailey's counsel has speculated as to this possibility. *See* Tr. 2794-95 ("We believe that the Bureau of Prisons conducted some type of inquiry which might include a statement or at least an opportunity to speak by

because defense counsel already had extensive opportunity to impeach Britton's credibility. *See*

*United States v. Muschette*, 392 F. Supp. 3d 282, 297 (E.D.N.Y. 2019) (Korman, J.), *aff'd sub*

*nom. United States v. Ramsey*, No. 20-860, 2021 WL 5022640 (2d Cir. Oct. 29, 2021) ("For

impeachment evidence, 'where ample ammunition exists to attack a witness's credibility,

evidence that would provide an additional basis for doing so is ordinarily deemed cumulative and

hence immaterial.') (quoting *United States v. Orena*, 145 F.3d 551, 559 (2d Cir. 1998)).[28]

Because the Government did not violate its *Giglio* obligations, the Court declines to exercise its

Rule 33 authority.

　　II.　　Motion to Compel Detective Valcourt's IAB File

　　　　On July 12, 2023, the Government submitted a letter under seal explaining that it had

inadvertently failed to disclose the full disciplinary history of Government witness Detective

Valcourt. ECF No. 607 at 1. As described by Defendant Bailey:

> Det. Valcourt testified that he and two partners were in an unmarked
> car and chased a speeding Chevrolet in Flatbush until the Chevrolet
> crashed at E. 40th Street. He testified that he was only about a
> second behind the Chevrolet when it crashed and that he was
> focused only on the driver whom he arrested. Det. Valcourt said did
> not observe the other passengers. His two partners arrested two
> passengers who were in the Chevrolet. The government asserted
> that there was a fourth passenger, Lorenzo Bailey, who got away.

---

Ronald Britton. Accordingly, since [Britton] may have received some benefit of some kind for cooperating perhaps
against the officer correction [sic] who smuggled contraband into FCI Fort Dix, we make that request because it's
relevant under 806 to impeach the declarant as a question of fact for the jury as to whether it believes the credibility
of the declarant, in this case Ronald Britton, who is not available for cross.").

[28] Even if those statements existed, the Court rejects Defendants' arguments that the Court was obligated to admit
these statements under F.R.E. 806. *See generally* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its
probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing
the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). These
statements need not have been admitted under Rule 403 for largely the same reasons they do not implicate the
Confrontation Clause: defense counsel *did* have the opportunity to expose facts to the jury and raise this issue,
making further evidence along these lines duplicative. *See United States v. Arias*, 74 F.4th 544, 551 (8th Cir. 2023)
("A defendant establishes a violation of his confrontation clause rights by showing that he was prevented from
exposing facts to the jury from which they could reasonably make inferences about the reliability of the witness.")
(citation and internal quotation marks omitted).

ECF No. 610 at 1.  As relevant here, the Government disclosed Detective Valcourt had six substantiated or partially substantiated IAB cases, indicating the following offenses:  having an incomplete memo book; failing to property safeguard and voucher prisoner property; incompletely or inaccurately preparing property clerk invoices; failing to timely notify his bureau he misplaced or lost his radio; and failing to safeguard department equipment and losing or misplacing his department cell phone.  ECF No. 607 at 2-3.  The Government's disclosure further notes that as that the Government is unaware of any civil lawsuit against Detective Valcourt wherein a court made an adverse credibility finding as to him, and that, as of the time of the trial, there were no substantiated or partially substantiated CCRB cases pertaining to Detective Valcourt.  *Id.* at 1-2.  The Government maintains this material is not *Giglio*, that "cross-examination on these topics would have been inappropriate," "and such information would have been immaterial to the outcome at Trial."  *Id.* at 1.

On July 24, 2023, Defendant Bailey filed a motion—separate from the Rule 33 motions discussed above—requesting the Court compel the disclosure of various materials related to Detective Valcourt as potentially *Giglio* material.  *See* ECF No. 610; *see also* 622, 638, 609. Defendant Bailey specifically moved to compel the disclosure of following items pertaining to Detective Valcourt :  "transcripts of interviews and hearings; audio recordings, complaints and investigative materials relating to all allegations against of [sic] Det. Valcourt, not only by IAB, but by all divisions of the NYPD, as well as complaints investigated by the CCRB, including unsubstantiated CCRB complaints, so that the court can determine what documents are *Giglio* material that must be provided to the defendant."  ECF No. 610 at 2.  The most specific case Defendant Bailey makes for reviewing these underlying materials is that "any supporting evidence that Det. Valcourt was untruthful and violated laws or regulations in the past would be

material to the defense." ECF No. 622 at 4.[29]  As such, Defendant Bailey requests that the Court review the underlying files "*in camera* and determines whether the defendant is entitled to see them." ECF No. 622 at 1.

The Government rejects Defendant Bailey's arguments.  First, the Government notes Defendant Bailey "does not cite a single case in support of its position" that "the government failed to meet its disclosure obligations" when it "did not include the underlying CCRB and IAB reports themselves." ECF No. 621 at 1.  Second, the Government asserts that "[w]hat is contained in the underlying CCRB and IAB reports that was not included in the government's prior letter concerns either (a) unsubstantiated allegations against a testifying witness or (b) allegations relating to a law enforcement officer that did not testify at the trial in this case" and is therefore not "pertinent" information.  *Id.* at 2.  Third, the Government asserts that "Supreme Court and Second Circuit precedent [establish] that a defendant is not entitled to receive" the underlying materials that Defendant Bailey requests.  *Id.*  Fourth, the Government maintains that any underlying CCRB materials are outside of the Government's *Giglio* obligations, as "[t]he CCRB—an agency independent of our Office and of the NYPD itself—does not normally provide the full investigative file, including material such as transcripts, body-worn camera footage and NYPD reports, even upon request for follow-up information relating to substantiated complaints." *Id.* at 4.  In this case, "as is standard, the government only possesses the allegation history and closing reports from which it quoted in its prior disclosure letter." *Id.*  Finally, the Government argues that Defendant Bailey's "request for underlying records pertaining to unsubstantiated allegations should be denied," as "such issues would not be material, and so

---

[29] Defendant Bailey asserts that Detective Valcourt lied under oath.  *See* ECF No. 610 at 1-2; ECF No. 622 at 3.

requiring the [G]overnment to disclose documents addressing those issues for an *in camera* inspection would serve no purpose." *Id.*

The Court agrees with the Government that its unfortunately belated disclosures regarding Detective Valcourt are not *Giglio* and therefore, the Government did not fail to meet its *Giglio* obligations as a result of its nondisclosure. *See supra* Section I.C.c.i (discussing *Giglio* legal standard). Undisclosed impeachment evidence is not material when, "although 'possibly useful to the defense,' it is 'not likely to have changed the verdict.'" *Avellino*, 136 F.3d at 257 (quoting *Giglio*, 405 U.S. at 154). Evidence of Detective Valcourt's substantiated or partially substantiated IAB offenses regarding incomplete memo books, failing to properly voucher or safeguard a prisoner's property, creating slightly inaccurate property vouchers, losing Department equipment, and failing to timely notify his bureau of his lost department radio are not probative of truthfulness, let alone so probative thereof that its disclosure likely would have changed the verdict in this case, and thus such evidence was not material within the meaning of *Giglio. See Avellino,* 136 F.3d at 257; *United States v. Daniels*, 566 F. Supp. 3d 191, 194 (E.D.N.Y. 2021) (Matsumoto, J.) ("As a general matter, [c]omplaints against officers are not probative of a law enforcement witness's truthfulness or untruthfulness unless the underlying conduct involves dishonesty.") (citation and internal quotation marks omitted). Indeed, this Court would have precluded cross-examination on these materials under Federal Rule of Evidence 608(b), as none of these allegations are probative of Detective Valcourt's truthfulness or untruthfulness. *See* ECF No. 469 (sealed order granting Government's motion at ECF No. 420 to preclude cross-examination on certain topics including, *inter alia*, substantiated or partially substantiated allegations regarding incomplete memo books, losing department property, and failing to voucher an arrestee's personal property); *see generally* Fed. R. Evid.

608(b) ("Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of[] . . . the witness.").

The Court further denies Defendant Bailey's motion to compel the Government to produce other investigatory documents pertaining to Detective Valcourt or to conduct an *in camera* review of such material. Fundamentally, Defendant Bailey is requesting materials pertaining to unsubstantiated allegations or complaints about which he knows even *less* than the previously discussed substantiated or partially substantiated IAB complaints. *See Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 556 n.16 (E.D.N.Y. 2011) (Matsumoto, J.) ("As defendants did not list the nature of the CCRB complaints, the court cannot assess whether the prior allegations would be probative for truthfulness or untruthfulness and therefore admissible under Rule 608(b). Nevertheless, even if the evidence were admissible under Rule 608(b), the court would deem the evidence inadmissible under Rule 403 because the prior allegations have not been substantiated."). As such, the Court finds Defendant Bailey has failed to make any non-speculative case for the *Giglio* materiality of these materials and denies these requests.[30]

III.    Defendant Agoro's *Pro Se* Letters

In letters to the Court dated January 1, 2023, Defendant Agoro requests that the Court: (1) hold an *ex parte* hearing to discuss his purported problems with his experienced defense

---

[30] Defendant Bailey originally requested materials related to investigations into allegations regarding Detective Valcourt by "all divisions of the NYPD." ECF No. 610 at 2. However, it appears that Defendant Bailey is no longer requesting those materials based on his assertion on reply that he is simply "ask[ing] the Court to examine the limited file of CCRB/IAB complaints against Det. Valcourt for materiality and usefulness to the defense." ECF No. 622 at 3.

counsel, and (2) provide him with copies of his docket and of the letters he had previously sent to the Court. ECF No. 573. The Court denies these requests.

In letters filed on June 5, 2023, Defendant Agoro raises issues regarding his representation throughout this case. ECF No. 594. To the extent these letters constitute a request for new counsel, the Court denies this request.

In letters dated May 24, 2023, Defendant Agoro raises further issues regarding his current defense counsel. ECF No. 595. Again, to the extent these letters request new counsel, the Court denies this request.

In a letters filed on June 27, 2023, Defendant Agoro raises a number of issues. ECF No. 601. First, he cites to what appears to be a legal research headnote for the proposition that the collateral order doctrine allows for appellate review of rulings prior to the entry of final judgment when that ruling denies a pre-trial motion to dismiss criminal charges based on double jeopardy. *Id.* at 1. Second, Defendant Agoro asserts that he never received a draft of his presentence report, and lists a number of objections to the PSR as written. *Id.* at 1-2. Third, Defendant Agoro enclosed a letter to his current counsel indicating his unhappiness with his current representation. *Id.* at 3. The Court acknowledges receipt of these PSR objections, and will consider them in relation to Defendant Agoro's sentencing. To the extent these letters request new counsel, the Court denies this request.

In a letter filed on June 29, 2023, Defendant Agoro raises concerns about his treatment by his defense counsel, the Government, and the Court. ECF No. 602 at 1. In further pages included with this letter, Defendant Agoro raises what appear to be further objections to his PSR. *See id.* at 2 (top of letter states "Re: Applying Proper Sentencing Guidelines); *see also* ECF No. 605 at 2 (including copy of these objections and noting that he was "sending again another copy

49

of things that should reflect on my PSR when it comes to sentencing guidelines & calculation"). Again, the Court will properly consider these objections in relation to Defendant Agoro's sentencing. To the extent this letter contains a request for new counsel, the Court denies this request.

In a separate letter filed on June 29, 2023, Defendant Agoro raises numerous complaints, many of which he had previously raised. ECF No. 603 at 1. Defendant Agoro also included duplicates of his apparent prior PSR objections with this letter. *Id.* at 2-7. To the extent this letter contains a request for new counsel, the Court denies this request. The Court will consider any objections to the PSR in relation to sentencing.

In a letter dated June 27, 2023, Defendant Agoro wrote to again express his dissatisfaction with his current counsel. ECF No. 605 at 1. To the extent that this is a motion for new counsel, the Court denies this request.

In a letter dated August 31, 2023, Defendant Agoro wrote again to express dissatisfaction with his counsel, both current and past, and to request copies of Government Exhibits and trial transcripts from his cases. ECF No. 617 at 1. The Court denies Defendant Agoro's request to send him files and, to the extent this is a request for new counsel, denies that request.

In a letter to the Court dated October 2, 2023, Defendant Agoro wrote that he wants "to put his pretrial motions on the record" in light of Defendant Agoro's attorneys telling him that the Court "sealed it off from the record because it was pro se." ECF No. 639 at 1. Defendant Agoro then raised a concern about his current counsel and requested discovery for the Extortion Action and discovery in the VICAR Action related to Detective Brown. *Id.* To the extent this is a request for the Court to send Defendant Agoro these materials, the Court denies this request. To the extent this is a motion for new counsel, the Court denies this request.

In a letter to the Court filed on November 7, 2023, Defendant Agoro appears to again raise objections to his PSR. ECF No. 640 at 1. The Court will consider any and all objections to the PSR in relation to sentencing.

In a letter to the Court filed on November 8, 2023, Defendant Agoro wrote to the Court saying, *inter alia*, that he is "not asking for an acquittal or a dismissal but only to be sentenced fairly," that he "accepted responsibility of my actions the moment I asked for a plea without double counting," and accused his attorneys and the prosecution of misconduct. ECF No. 641 at 1-2. To the extent this is a request for new counsel, the Court denies this request. To the extent this is a request for the Court to properly calculate his Guidelines, the Court will consider such calculations in relation to Defendant Agoro's sentencing.

## CONCLUSION

For the foregoing reasons, the Court DENIES the Defendants' motions in their entirety.

SO ORDERED.

s/ WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: March 31, 2024
Brooklyn, New York

52